Case number 16-1075 Ameren Services Company et al. Petitioners v. Federal Energy Regulatory Commission Mr. Jones for the petitioners, Ms. Kafer for the respondent Good morning. May it please the Court, Christopher Jones for the investor-owned utilities for the petitioners in this case. My colleague, Kurt Jacobs, is with me this morning at Council's table. I will endeavor to reserve three minutes for rebuttal. Your Honors, in the orders under review, FERC claims the rather remarkable authority to compel investor-owned companies to construct, own, and operate interstate electric transmission facilities on a non-profit basis. These orders violate the Constitution, the Federal Power Act, and the Administrative Procedure Act, and to our knowledge, are unprecedented. I would like to address three basic components of our objection this morning, if I can. First, the FERC orders acted completely outside the statute. Second, even within the statute, the orders failed both of the tests required for Section 206 rate change. And third, the orders are otherwise arbitrary and capricious due to FERC's departure from its own precedent and its lack of substantial evidence. Each of these, we believe, provides an independent grounds for vacating these orders. First, FERC has a fundamental statutory problem here, a threshold problem, if you will. FERC claims in this case the authority to compel investor-owned utilities to construct, own, and operate high-voltage transmission facilities with no opportunity to earn a return. That's just not a power. But let me ask you to address the Commission's response to that argument. In other words, you're isolating this one aspect, but there's another aspect of the process by which you can recover. And the implication of FERC's argument is thereby protect any right to a return. If Your Honor is referring to the fact that the what we call the transmission-owner funding option, under which we do earn a return, that that's still available, FERC argues that that is, in fact, still in the tariff. And it is. But what FERC did was say you can't use it unless the customer agrees. And our position ---- But there's another whole process, is there not, for your coming to FERC in terms of getting certain costs put in your rate base in connection with maintenance and operation? I see you, Your Honor. I think that was FERC's argument that somehow Section 205 provides an opportunity for us to come back at a later date. I think the problem with that is FERC has taken the position, as a matter of law in this case, that we are entitled to no return on these facilities. Their argument is we've taken no risk, we've made no investment, and we should get no return. What is it, to make clear, what is it you're entitled to get? You're entitled to get operating expenses, right? Well, operating expenses are recovered under a separate part of the tariff, Your Honor. That's what I think my colleague is referring to. Okay. Thank you, Judge. Yes, the operating expenses are something completely different. That is, again, the model here is ---- But you said, did you overstate it when you said we're obliged to construct, own, and operate without a return? Because you do get expenses for operation. That's, I think, what my colleague was referring to. Is that correct? Yes. Okay. We get expenses for operating the facilities. So, for example, the cost of, I would say, turning the wrench on the tower and putting fuel in the bucket truck to go check out the lines, those are operating expenses that are recovered in a separate part of the tariff. But that's really separate and apart from the ability to earn a return for our investors, which is what we believe the fundamental flaw of the commission's orders are. But the commission's response to all that is you didn't make any investment. Your shareholders have no right to a return on an investment you didn't fund. Someone else paid for it. That's right. That's their whole argument. That is their whole argument. This is a weird situation. It's a very weird situation. It's totally weird where someone else pays here, the generators pay for the construction of this. It's just not normal. But the fact is that that's FERC's point. And FERC's point is you don't get a return because you didn't make an investment. Well, there's a number of responses to that. First, you're right, we agree with you, Your Honor. We are pretty far afield here. But I think the more important point is there are two fundamental parts of risk that justify a return. It's not just financial investment. It is the operating risk. In fact, this Court has dealt with it. FERC said, FERC has a finding that the transmission owners failed here. They said, the Commission says that the transmission owners never explained how these upgrades add to your risks, as opposed to reducing your risks. That's right, Your Honor. And the notion that somehow we could, for example, double the size of an interstate electric system and reduce our risk is we don't buy that, Your Honor. In fact, the Commission's argument for reducing risk is that somehow it reduces congestion on the lines. Well, that's one example. That is one example. But that is the primary — Isn't that true? Well, environmental fines, other penalties that might arise as a result of this expansion. That's right. Congestion is merely usage of the lines. That has nothing to do with the risks that we're talking about. I mean, the risks of somebody getting electrocuted on the line, the risks of — Yes, go ahead. And the risks of, for example, I think we cited in our brief the 2003 blackout, where putting in one additional line creates the risk that the tree falls on that particular line and puts us at risk for loss in that case. So the notion that somehow we could build more interstate transmission lines and reduce our corporate risk from an operational standpoint, we just don't buy. Your point is that FERC never responded to that argument. That's right, Your Honor. That specific argument that you have various risks beyond the capital invested and you're entitled to compensation for that. Your basically argument, as I can understand, is FERC is really attacking your business model. Precisely, Your Honor. In fact, I would argue even when we're talking about risk, even if we assumed arguendo that we had none, which, of course, we don't concede, I still don't think that puts the commission in the position where it's got the authority to force us to operate this nonprofit business model. Even if we're held harmless, that's not the relevant legal standard. Holding us harmless from a business model that they've dreamed up does not satisfy this. If you were to persuade us or FERC that you were entitled to be compensated, say, for the risk of lawsuits or something like that, that's different. That's like compensating you for the cost of operating it. FERC still says that's the most you'll get, right? To accept your argument then and go further, that is that you're entitled to a rate of return on it, that must mean that you're entitled to a rate of return on a construction of a project you didn't pay for. That's where I'm having problems. I get your argument that the transmission owners should be just like they should be compensated for their operating expenses, right? Right. They should be compensated for any risks they can prove. But FERC said you haven't demonstrated any of those. Well, first of all, I think we did. I mean, again, let's just take the ---- Wait. Where did you do that? Well, the four categories I think that we talked about below and in our briefs were construction ---- But what about before the commission? I'm asking before the commission. Oh, in ---- I'm sure in all of our pleadings. And I'll pull a ---- And you're sure. Why don't you just tell me where? That's what I'm asking you. I will pull a pinpoint for you and bring it back on rebuttal if I can, Your Honor. But I believe we filed in our initial comments in response to the ---- I mean, see, FERC says, FERC says you're telling me this statement is false. Here. Petitioner has not explained. Wait a minute. Hold on. Transmission owners do not explain. I'm reading from the rehearing order. Transmission owners do not explain how upgrades should be considered additive to the reliability risks versus potentially diminishing, virtually potentially mitigating. Right. So you're telling me that statement is false. I believe so, Your Honor. We have throughout the case ---- What do you mean you believe? It either is or isn't. I believe in it. I'm going to check and pull a pinpoint site for you and bring it back to you on rebuttal if I can, Your Honor. But that was the fundamental case we made below was that there are these specifically identified operational risks that go uncompensated. But if I may make a broader point ---- But let me just be clear when you give us a site. It should be a site that says you cannot recover these operating costs and see that's what I think FERC is saying. It's not saying that in this other process you couldn't recover and thereby get your rate of return on your business enterprise. It's just saying on this segmented aspect that we're dealing with here, since you're not putting up any money for this construction, you're not entitled to any rate of return because there's no investment. Right. I guess if I'm understanding, Your Honor, so we're looking for ---- Let me just be clear. All right. And FERC was clear. There are several processes at issue here. And basically FERC is saying you haven't told us, you haven't identified, what you will be unable to recover to assure that you receive this reasonable rate of return on your business enterprise. And FERC says we're only dealing with this segmented construction right now. And that's why when Judge Silverman questioned your opening statement about we're being forced to build, operate, maintain, and we're not getting any rate of return, FERC says that's a clear overstatement because you have the opportunity in this separate process to make your case as to why these And let me be clear on one thing, and I appreciate that very much, Your Honor. We are not asking for specific recovery of, for example, costs of litigation. What we are talking here is earning a return for our investors that compensates them for the risk of being on the hook. I thought you were in your brief. You specifically said FERC has said you can't be compensated for liability. And that's why we're talking about shareholders being on the hook for this. So you can't. You did identify in your brief that FERC has decided in its cases that you're not entitled to be compensated for liability for various matters. That's right. So, for example, the reliability violations. We can't turn to our rate payers if we get a million-dollar civil penalty under the commission's new authority for a violation. We can't get that from rate payers. Our shareholders are on the hook for that. But they have been, and they've been put on the hook for that risk for these projects. Suppose liability because somebody falls on the, some injury. That's right. And we have no opportunity. You're alleged to be negligent and so found. Do you get any recovery from that? We get no rate recovery for that, Your Honor. No rate recovery. Because you have insurance, and your costs of insurance are in your rate base. That is true, Your Honor, but insurance has both coverage limits and deductibles, which we pointed out to the commission. So, again, there are, and I'd like to, if I might zoom out for just a moment. Let me just ask you, I just want to ask you a clarifying question from what you said, and then you can make your point, because I just want to see if I understand. So your point is, can we use your highway example for a minute? You raised the highway? Yes, sir. So if you have a highway that has two lanes, okay, and I give you the money to build and operate a third lane, right? I take it your point is that although you're not entitled to compensation for, say, the risk of litigation or reliability problems on the two lanes you funded, right? Right. You're taking on a new risk on the lane I funded that you're not compensated for, that your investors didn't invest in. In other words, they didn't take that risk. Is that your point? Yes, Your Honor. The new lane presents incremental risks of loss to the shareholders. And that your shareholders didn't invest, they didn't put in money and therefore take the risk. Well, right. As corporate shareholders, they are on the hook for that risk, even though specifically, you know, we've got this strange situation where the capital came from somewhere else. And you also make the argument, I want to make sure it's out in the open, that investors invest in the whole enterprise. They don't invest segmentally on different parts depending on who put up the capital. That's right. In fact, that's why when the corporate shareholders invest in the entire company and they look at our company, for example, my client, the ITC companies, interstate transmission is all they do. And if they look at our business model and they see an entire line of that business model that is run essentially on this nonprofit basis, we have to build these upgrades in this segment of the business. But there's nothing in it for them, for that segment of the business. What did you think of the FERC saying, well, we heard that argument, but after all, there is another option whereby the transmission owners would build the upgrade? Well, that's right. And to be clear, this is the point I'd like to leave the Court with, if I could. We are not specifically asking. Listen, did you hear what I said? Remember, FERC said, well, after all, there is a separate option whereby the transmission owners could build and construct and put up the money for the upgrade. That's right. And that's what we'd like. The response to that is, it sounds like Marie Antoinette saying let them eat cake because the option is no good if the other side has a veto. That's precisely it, Your Honor. And that is the option we'd prefer to use, but we can't use it without the customer's consent. In other words, your argument is FERC's response to your view is a non sequitur. Exactly, Your Honor. Let me ask you this. Suppose your petition were to be denied, and in a subsequent rate proceeding, you introduce evidence talking about the expanded liability, the nature of the investment, and all of that, and FERC says, but you didn't build it. So this third lane, you can't recover anything, even though now the business enterprise involves three lanes and you have additional maintenance costs, exposure, et cetera. Wouldn't that be the occasion to come to us and say, FERC has acted contrary to the statute, that you are being denied a fair rate of return on your investment? In other words, maybe I misunderstood what FERC was saying, but that is sort of the consequence. I understand your point about you can't do this on your own. You've got to get the generators to agree with you. So that option is not meaningful to you, although FERC suggests that's because you want to gain more than the generator. The theory is this is going to increase your profits, all right, make it a better system. So you're going to make lots of money and your shareholders are going to be as happy as they can be. So you come back where you've been denied a rate of return in light of you're now operating three lanes, not two lanes. Then all of these issues come into play. All I'm trying to say is, is this sort of a premature attack in anticipation of a later proceeding? Not at all, Your Honor. And the reason is those customers that pay that rate, we're talking there about a separate class of customers. The generators here have the ultimate cost responsibility. And the fundamental problem we have is that the Commission's legal basis is that you are owed no return. You have no risk that we recognize. So we have no faith that in any future 205 proceeding would somehow turn out differently. So if a generator is building this upgrade and somebody falls, I don't know, stumbles and breaks their leg or something like that, you're saying that the generator is not liable, that you're liable? That's the program that we've got here. We actually do the construction. We own. We operate. All that the generator does is give us the initial capital. So they've got no on-the-ground liability, as it were, at all. That's all the risk that's on us and our shareholders. So they just give you a bunch of assets or, you know, transfer funds to you, and then you do everything? That's right. The latter, Your Honor. They transfer the funds to us, and we do everything else. You know, one thing that I would like to clarify, because I think it's on page 6 of the government's brief, our first brief, said that somehow the expenses of the transmission owner were to build the upgrade itself. Somehow or other, it would go into the rate base for all customers. And I couldn't, on page 6, and I couldn't figure out whether that was true. Is that correct? It's not correct. The work was just wrong in the brief there? I'll recheck what they said, but, no, these projects go into our rate base at zero. So that's how they earn their return. No, no. I'm talking about if you build. That's right. I'm sorry. You know, if we build. Yes. If we build them, they don't go into normal rate base. They get assessed back to the generator. It doesn't go into the normal rate base. No, no. So no other generator pays for it. No. Yeah, I thought that had to be wrong. No, that's not correct. Yeah. Wait, the generator pays for it? Yes, the generator that caused the need. So if the transmission owners build it, the rate of return on that investment is charged to the customer, right? It is charged back to that specific generator under an agreement that includes a rate of return. So, for example, if. In that situation, the transmission owner is getting fully compensated for the risks of the additional project, right? So why shouldn't maybe. I couldn't hear your question. What? I could not hear your question. So in that situation where the transmission owner pays for it, you're being. The transmission owner is being fully compensated for the risk. Yes, Your Honor. And. Because it's in the rate of return. In the rate of return. That's right. And that rate is paid for by the customer, that customer. That specific generator. That new customer. Yes, sir. Yes, Your Honor. Okay, so why shouldn't. If that's the right. Why isn't the right model then for where the generator picks the option that is generator decides to fund it? Wouldn't all of the transmission owners concerns be solved if the generator were responsible for. For the costs of lawsuits and reliability on when that's all the problem. No, you don't need a rate of return. It's just that the customer pays for it. Customer bears the risk of it. So if I understand Your Honor's hypothetical. It may be a totally ignorant question. I'm sorry. It's okay. I think if what you're suggesting is somehow we found a way to include some sort of indemnity. Yeah, exactly. Yeah. I think we still have the fundamental problem with operating this sort of nonprofit, even if it's risk-free business. That's not. But you do get compensated, as Judge Rogers pointed out right at the beginning. There is a process for getting compensated for operating costs. For operating costs. Okay, well, maybe lawsuits and things like that should just be included in that. It could be, Your Honor. I don't think that that ultimately solves our problem, though, because, again, our investors look at what business we are in and see this, even if it's risk-free, this non-revenue-producing business that the government has ordered us to undertake, where there's nothing in it for them. And that builds into the entire risk of the organization. In other words, if you're a CEO of a company, a large company, and increasingly portions of the company are portions that you have no rate of return on, that can't help but have an impact on the attractiveness of your enterprise as an investor, no matter who puts up the capital. In other words, your fingers are being taken off the body. Correct, Your Honor. Yes, that's exactly right. Did you make that argument before FERC? Did we make that specific argument? Yeah. Yes, absolutely. You're going to show me on rebuttal where you made it? That we said our shareholders were at risk? Yes, Your Honor. I took your point to be not only did you make that argument, but FERC never responded to it. Correct, Your Honor. I don't believe they sufficiently responded to the risk that our shareholders continue to bear. The overall risk. Yes, that's right. In other words, your point is FERC is being too limited in looking at the return only on this particular capital allocation. Yes, Your Honor. You're not looking at the whole picture. That's right. Why don't we hear from the respondent? Thank you, Your Honor. Good morning, Your Honors. Holly Kafer for the Commission. I think I need to start by just going back to the context and perhaps to page 6 of our brief, which I think will help us all to understand what's going on. There's two different regimes, if you will, for interconnection. One is the standard regime set up under Order 2003, which is not in place in the Mid-Continent System Operator. Under the standard procedure, under Order 2003, that we reference on page 6 of our brief, there at the top of that page, for a network upgrade of the type that we're talking about here, the transmission provider is responsible. The transmission provider, so the folks in the place of the petitioners here, are responsible for the cost of those types of facilities. Again, under the Order 2003 standard procedures. MISO, Mid-Continent System Operator, has a special exception, and that's what's at issue here. The transmission owners came to the Commission several years ago, 2006, again in 2009, and asked for changes to have network upgrades, the types of facilities that are at issue, be fully paid for by the generators. So that's the regime that's in place that's discussed later. Why did you say on page 6 it would go into the rate base and all the customers would be paid? That's what puzzled me. So under Order 2003, the generic system that was set up. Oh, in other words, we were talking about other situations, not this case. Right. Yes. Okay, I didn't quite. Because it's important to the context. I didn't quite understand that. All right. And here's, I have some questions for you. You rely on two points. FERC relies, when I say you, I say FERC, of course, relies on two points. One, this is discriminatory to the prior system is discriminatory because we're allowing the transmission owners to build, operate the upgrade and put it into their base for rate return. And that's discriminatory. And you also argue that it's unjust and unreasonable. There's two separate arguments, right? I mean, two separate points on which you rely. The way that I see the two points in this case, Your Honor, are that the existing system. No, no, no, no. I'm asking what FERC said. I read FERC as relying on, and it's important, they rely on two separate points, right? They rely on just the existing system is not just and reasonable. And more importantly, I suppose, it's discriminatory. Yes. Now, as I read your brief at page 24, as I recall, if I remember it, I don't have it. I'm not sure I can find it. But you point out that discrimination in this case would be allowing the transmission owner to charge other two different generators a different amount for construction. And I was trying to figure out why in Lord's name would a transmission owner discriminate amongst generators. Now, and that didn't make any sense to me. Why? And is there any evidence of that? There's no economic reason for the transmission owner to discriminate amongst generators. Affiliates. No, not affiliates. Generators. Right. No, affiliates is one answer. I thought the discrimination was between, I thought the discrimination the commission found was between the treatment of generators who are connected directly to the transmission system and generators who are called affected, who are not connected directly. The latter didn't have the same option. Am I wrong about that? What you understand the agency to have said, and you can point us to the page or paragraph. The commission made both findings for different purposes. Judge Tatel, to take the discrepancy that you identified first, the commission found that it was unduly discriminatory to discriminate between the different types of interconnecting generators directly or indirectly in finding that the existing funding options were unjust and unreasonable and unduly discriminatory. Judge Silberman, the type of . . . Here's the exact language. Page 24 of your brief, which refers to a site in a FERC opinion. Putting that decision in the hands of the non-independent transmission owner, the decision, of course, whether or not to build at your own expense or charging the generator, creates unacceptable opportunities for undue discrimination by affording a transmission owner the discretion to increase the cost of interconnecting service to particular interconnecting generators, but not others. Why? And what evidence of that? I could understand if, as one of my colleagues pointed out, the problem was a transmission owner that also has a generator, but that's not what the discrimination is. This is alleged discrimination between different generators, and I couldn't figure out what evidence of that or even what logic of it. So I think that the affiliate type of discrimination that this Court addressed . . . No, this is not affiliate. This has got nothing to do with affiliate. Page 24, you talk about, and FERC talked about in its decision, giving an opportunity to the transmission owner to discriminate amongst generators. In other words, generator one has no affiliation with transmission owner, and generator two has no affiliation with transmission owner, but there's an opportunity to discriminate between those two generators. I suppose if one generator is the brother-in-law of the transmission CEO, there'd be an argument that they could discriminate. But otherwise, I don't understand the logic of that. I read that language to . . . In other words, your position is, I don't have to show actual evidence of discrimination if there's an incentive. But what's the incentive? To discriminate amongst generator owners? It makes no sense. If I can, I read that language to include the potential for affiliate discrimination. That's not what it says. The language does not say that it doesn't include the potential for affiliate discrimination, but the commission . . . It doesn't say anything about Christmas either. I mean . . . The commission also identified other types of discrimination that can be at play here. Well, okay. Then you do concede. Specifically, the FERC did rely on the opportunity of the transmission owner to discriminate amongst generators. Yes, Your Honor. And you have zero evidence to support that, and you have zero economic logic to support that. I don't think that's accurate. Certainly, the commission would not concede that. Well, tell me what the logic is. Again, I read that language, and the commission actually spoke broadly enough in these orders to incorporate the idea of affiliate discrimination. That is, when a transmission owner has a relationship with, either as a subsidiary . . . There's one transmission owner of this group that has its own generator, but these are dying out ever since the original, what is it, Order 800 or whatever it was. All the transmission owners are getting rid of their generators, and it's all separate. In this case, most of the transmission owners don't have generators. But that's not what you say. You say what's troubling us is giving the transmission owner the opportunity to discriminate amongst generators. And that doesn't make any sense. I think, Your Honor, that's because you're reading it to exclude the idea of affiliate discrimination. The commission here invoked the very same type of discrimination that was at issue in, for instance, this Court's orders affirming Order No. 888 in the Transmission Access Policy Study Group case, and also in the Supreme Court's same orders affirming the same commission order, New York v. FERC. Okay. I hear your answer. I'm not persuaded, but I hear your answer. Now, here's a hypothetical for you. Under FERC's logic, suppose transmission owners sometime in the future were faced with the possibility of a major, major, major change in their physical plant. There are new possibilities for incredibly fast transmission. It would involve a billion dollars of investment in my hypothetical company. And so all of the generators of any kind that would support this upgrade get together and say, you know what? We can build this cheaper than the transmission owners. So we'll propose to FERC that we build it all. And therefore, it will not be in the rate base. And the transmission owner will be left to administer, to run this operation, but it gets no rate of return. It gets expenses but no rate of return. That's the theory of your case, right? That could happen. Because the only rate, the only compensation you get is for direct investment. The theory of our case is that — Well, deal with my hypothetical. Sure. And I can do that in the course of this. The theory of our case is that thus far, the only risks that have been identified are already covered, and that if there were a specific case invoking special types of risks for which there was some sort of demonstration — The risk is you're eliminating my business. You're taking it finger by finger away. And eventually, you'll take it by arm by arm. Our business model is based on rate of return. And transmission owners — If you force me to operate the non-profit operations, you're going to turn me into Harvard University and then, you know, the return is terrible. And I believe that — I did hear that. Return was terrible this year. Went down this year was terrible. I know, but they've got this thing endowment. Terrible. Doesn't make any sense. You understand that this is — But, you know — This is what I'm — In other words, I think this is such a — this is a much more fundamental challenge than FERC realized. And you didn't respond to that. The commission has never held, the courts have never held, that a utility can collect a return on investment where there is no investment. That's what's novel about this case. And so the commission said — So in my hypothetical, that would work, that the generators could get together and say, we're going to put up the billion dollars for this new transmission operation, and the transmission owner would be limited to its salary and operating expenses. Its business model — Transmission owners continue to collect — It turns into a non-profit operation. As Judge Rogers pointed out earlier, will continue to collect return on the remainder of their rate base. The idea that there could be non-rate-based facilities — Well, I'm just eliminating — I'm just, in my hypothetical, eliminating the rate base. Yes, I understand. And what transmission owners have not shown is how the lack of an investment enhances their risk. Again, it goes back to where's the specificity in the arguments that they made before the commission on risk, specifically as to reliability risk. The commission explained that it thought, in the commission's view, there are at least some facilities, network upgrades, that will mitigate a transmission owner's risk. And transmission owners simply did not respond to that at all until their reply brief in this case. And to go back to, just very quickly, on the question of the increased costs and the incentives, I do want to point out that the commission does also rely on the increased costs facing generators from the security that is required. The greater term of the security, 15 to 30 years worth of security, under the transmission owner funding option as compared to the generator funding option. So, Judge Silverman, you don't need to reach the incentives question in order to find for the commission on that ground. Can I just have just one question? Let's see if you can help me understand this. Counsel for the petitioner mentioned the risk of lawsuits. So, the transmission system can't build that into its rate base because shareholders who choose to invest in this company, right, that's a risk they take. That's part of the risk of doing business. It has to be paid for by the shareholders, not the rate payers, correct? Right. That's the way that works. Now, if the system is significantly expanded by generator funding enhancement, the shareholders who bought into the original system never took account of the risk of increased lawsuits on the enhanced system. Right? That's his point, I think. And, in other words, they made an investment decision based on a certain set of risks, including the risk of lawsuits on system A. Now they're operating system A plus one, but they never accounted for the risk of lawsuits on the expanded system when they bought their shares in system A. Does that make sense? I think that expands somewhat on the way the transmission owners have presented the argument. Yeah. Okay. So, that brings us back to what the commission held here, which is that whatever this enhanced risk is simply has not been demonstrated before the commission at this point, which is why the commission specifically went to great lengths to explain that the door is open for the transmission owners to come back in. And that line of reasoning was acceptable to the Supreme Court in New York versus FERC, and it should be. And maybe get a rate of return, or just get compensated for the costs of the increased risk? What's open to them? What is open to them? With the orders as they stand, to get compensated for their costs. There's no dispute that their O&M operation and maintenance costs are covered. In a future case, for instance, the new billion-dollar investment to which Judge Silberman referred, if there were something special and if there were an evidentiary basis for it, transmission owners could come back in a future Section 205 filing. Counsel for Petitioners acknowledged that to seek recovery, to seek a profit on that. I see. Okay. You mean to seek rate of return? Yes. Even though the generators put up all the capital? I thought your theory was if the generators put up all the capital, then the transmission owners can't get rate of return. And what I'm referring to here is how the Commission left the door. Isn't that true? What I'm referring to here is how the Commission left the door open for a future case where there is a demonstrated specific risk. That's what we're lacking here. If the Court reviews transmission owners' arguments before the Commission on risk, they will see that the size of those arguments really pales in comparison to what they've now put into, especially their reply brief, where they've added at least some specificity. Well, it seems to me they made the arguments before FERC. They do make them better in the Court of Appeals, but that is not unusual. Well, the question is did they make the arguments sufficiently specific that the Commission could respond as opposed to saying generally our risk will expand? And the Commission did respond. It never said that 205 was not open. They just talked about a timing of opening. Specifically in paragraph 17, the Commission did respond to basically what was a list in a sentence or two in their request for rehearing of the types of risks they felt were not covered. So the Commission responded that much. But what the Commission said there was we haven't seen evidence. In other words, the Commission needed more to be able to come up with some way to value that risk that quite honestly was not the full investment that the generators had put in. So, you know, I think that the onus is really on the transmission owners here because, first of all, they are asking for something novel, and that's a return on no investment, as opposed to an ROE without the E is the way that I conceive of it. Wait a minute. You even authorized it in this order. I'm sorry. I don't understand, Your Honor. After all, you said either option is legal. So now you're attacking one of your own options. No, no, no. You don't understand what I mean. I'm sorry. I don't, Your Honor. You were just denigrating the notion that the transmission owner should ever be entitled to return on a situation in where the generator puts up the capital. But, in fact, your order allows either option. No, Your Honor. I don't believe that's correct. Yes, it does. That is your whole argument. In response to them, you said, well, after all, there's two options here. Now, their answer is, yeah, but that we think one option is totally inappropriate. You're saying, Your Honor, you're suggesting one of those options is, the other option is bad, and yet you allow it. So, two things. First, they seem to assume that an interconnecting generator will never choose transmission owner funding, but, of course, there's nothing in the record to support that. Two, just on the- Say they will never choose it? I think they specifically said that multiple times, Your Honor. They just said that option is unfair. They said normally in the past, the transmission owner builds its own. Right. So, I understand transmission owners to argue that an interconnecting generator will never choose the transmission owner funding option, which is what they refer to as the self-funding option. And let me just, you know, talk a little bit about how that funding option works. Under transmission owner funding, the transmission owner does pay the capital costs, and it does put those costs in its rate base. So, and then it collects the costs back from the customers over time. Not all the customers, just that generator, right? That's what, that was the confusion on page six. Right. So, in the Mid-Continent System Operator, it's just from the generator. In Order 2003, which we discussed on page six of our brief, it's from everyone. I see. All right. Counsel, any other point you want to make? I don't think so, Your Honor. Thank you so much. All right. Counsel, for Petitioners, we'll give you a minute. Thank you, Your Honor. Just a few quick points. First of all, I would point the Court to Joint Appendix 272 and the pages that follow. That's our first rehearing before the Commission where we specifically address the business risks. I'll quote just briefly. And what did you say? We said that to understand how the taking occurs in this instance requires a fundamental component of the ROE, an understanding of the ROE, the Commission sets rate of return based on financial and business risk. Those business risks associated with transmission include lawsuits, reliability, compliance obligations, environmental risk, construction risk, among others. And why doesn't that all go into your rate base? Because that, those are shareholder risks. We cannot put into rate base and recover from our customers the risks of loss in those particular situations. I know. But in your reply brief, you suggest there are all kinds of things that you can recover. Let me just ask you this. As Counsel pointed out, the transmission owners requested this exception, correct? To the order number 2003. By this exception, the — Well, to have the generator, the generator customers pay for the upgrade. Have the ultimate funding obligation. I believe that was part of — This is just pursuant to your request or the owner's request. Not at all, Your Honor. That is fixed. In fact, that's not, it's not challenged here. That is not, you know, it was not before the Commission in this case. But what did that mean when under order 2003 you had these options? And you said, no, we want an exception here, all right, where the generator pays. The order 2003 model was that the generator put up the money and we invested, and I'm sorry, we constructed, owned and operated the facilities and earned a return. I understand that. And FERC says you have the opportunity still here when the generator agrees. And you said we want this exception where the generator pays. So the generator pays, you're not paying, and FERC says you don't get a rate of return on that investment. You go down that option. I think the Commission's brief may confuse two things. No, I'm not looking at the Commission's brief. I'm looking at FERC's orders. Yes, ma'am, I think — I'm not accepting that its brief misstates. I'm simply trying to focus on the orders and how we got here. Right. Because it was because of the transmission owner's request that FERC granted. And so now under that procedure, this is what FERC has come up with, and you're protesting that on grounds of your being forced to act as a nonprofit. Well, this is what you requested. We want the financial burden to the generating customers on the construction of the upgrade. That is the ultimate funding responsibility going to the generator is a separate question of whether and how they satisfy that payment obligation. What do you mean in terms of how much interest they pay and that sort of thing? Well, that's right. There are always three options. That's not the issue here. The issue is you're saying you're being denied a rate of return for this upgrade and that the Commission has failed to take into account the business entity's expanded risks. And what FERC says is, in effect, this is not the exact word, but this is a 205 issue. Come back with 205, and then go to the Court and say that FERC is acting beyond its authority or is arbitrary and capricious. But we're not there yet. On that point, Your Honor, again, if the Commission's theory holds here, we'd have no basis under 205 to come back to the Commission. They will have successfully satisfied this Court that we are owed no return on that risk. So I don't see a path forward under Section 205. On that investment, which is distinct from the risk, that's all to come in the 205 proceeding. That's what I'm trying to get you to acknowledge. I mean, why would you have requested this if it wasn't in your financial interest to proceed this way? To put all the financial burden on the generating customer in the construction of the upgrade. The reason that was requested was because there were specific policy drivers at the time, generators were siting inefficiently, and local load serving entities were burdened to an extraordinary amount. So the Commission endorsed shifting that funding burden. And now you don't want to be in that position. Well, when that happened, the way that that funding was implemented, there were always two options at that time for us to earn a return. That option was never implemented in a situation where we would be forced to do that on a non-profit basis. It wasn't until this order. And you have this fallback position. That's what the Commission says. You do have an option. And your point is, but we're not in total control. And the Commission said that was the problem we addressed originally. So if you and the generator can agree, then you'll get your rate of return. Otherwise, come back to us in 205. But 205, again, I don't see any path forward for getting a rate of return. But you want us to predict that the Commission will not allow you to put in your rate base demonstrated risks that are traceable to this upgrade. And how can we do that? I think, Your Honor, what the Commission is suggesting is that categorically, this line of business incurs no risk. They say that. We have no risk that should be compensated. So I don't think it's a matter of proving it up in a future case or predicting the Commission. They say categorically, you don't incur this risk. We're not going to compensate for it. So, again, I don't see Section 205 as letting us off the hook now or in the future. The interconnection question is different from the upgrade. In other words, who pays for the interconnection? The interconnection itself is paid. So the cost there of actually hooking up the generator into the system is paid by the generator. And that's never in the rate base. That's never in our rate base. And that's not an issue in this case. No, Your Honor. What's at issue is what you pay or what, yes, what you do to upgrade, who pays for that and whether that's in the rate base. That's right, Your Honor. When we upgrade our system to accommodate the generator hooking in. What about my hypothetical of a new billion-dollar investment being funded by the only 20 generators rather than the transmission owner and, therefore, thereafter, no rate of return? Is that conceptually? Do you agree conceptually that's exactly, that's just a broadening of what FERC is doing? Absolutely, Your Honor. I mean, they have ordered us to undertake a line of business that produces no profit and no opportunity to earn a return. That is, again, fundamentally contrary to the entire rate-making scheme under the Power Act. You basically challenge their contention that the only return is, that you're ever entitled to is based on the investment. Yes. In fact, let me emphasize that the point the counsel made is completely undermined by Order 2003 itself. That's exactly what happens under Order 2003. We've been putting transmission upgrades in rate base and earning on them for 13 years, even though the generator provided the money. Not under Order 2003. Under Order 2003, Your Honor, the generators ultimately got their money back, but they financed it. Right. I understand the credits, et cetera, but we're not under that order. That's the whole point. Well, but counsel suggested that the commission has never endorsed this idea that you get no return when you have no money at stake, but that's exactly what happens under Order 2003. All right. I think Judge Taylor has a question. No. I change my mind. Anything further? No, ma'am. All right. We'll take the case under advisement.
judges: Rogers, Tatel, Silberman